UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

_____
                                                     )
JAMES WALSH,                                         )
                                                     )
            Plaintiff,                               )
                                                     )
v.                                                   )
                                                     )
ZURICH AMERICAN INSURANCE COMPANY; )
ZURICH AMERICAN INSURANCE COMPANY  )        Civil Action No. 1:12-cv-00072-SM
D/B/A ZURICH DIRECT MARKETS; ZURICH  )
AMERICAN INSURANCE COMPANY D/B/A     )
ZURICH NORTH AMERICA COMMERCIAL;     )
ZURICH AMERICAN INSURANCE COMPANY  )
D/B/A ZURICH NORTH AMERICA;           )
AMERICAN ZURICH INSURANCE COMPANY; )
UNIVERSAL UNDERWRITERS INSURANCE     )
COMPANY; UNIVERSAL UNDERWRITERS      )
INSURANCE COMPANY D/B/A              )
ZURICH DIRECT MARKETS,               )
                                                     )
            Defendants.                              )
_____)

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION FOR DIRECTED VERDICT**

Pursuant to Fed. R. Civ. P. 50(a) of the Federal Rules of Civil Procedure, Defendants

Zurich American Insurance Company, American Zurich Insurance Company, and Universal

Underwriters Insurance Company (collectively, "Defendants" or "Zurich")[1] respectfully request

that the Court enter a directed verdict for Defendants with respect to each of Plaintiff James

Walsh's ("Plaintiff's" or "Walsh's") claims, including breach of contract, breach of the implied

covenant of good faith and fair dealing, wrongful discharge, and unpaid wages.  As an initial

matter, payments under the incentive plan were ERISA payments, subject to ERISA's exemption

---

[1] Plaintiff erroneously named Zurich American Insurance Company d/b/a Zurich Direct Markets, Zurich American
Insurance Company d/b/a Zurich North America Commercial, Zurich American Insurance Company d/b/a Zurich
North American and Universal Underwriters Insurance Company d/b/a Zurich Direct Markets in the Complaint.
These alleged defendants are not corporate entities.

provision, Section 410(a).  As a result, Walsh's state law breach of contract claim is preempted by ERISA and must be dismissed as a matter of law.  Moreover, even if the Court were to find Walsh's contract claim viable, the claim fails because the document on which Walsh seeks to base his claims is merely a draft document, which neither Zurich nor Walsh approved or acknowledged as a final compensation plan.  Further, because Walsh was an at-will employee, Zurich had the ability to alter his compensation at any time.   Accordingly, Walsh fails to establish that he and Zurich entered into an enforceable contract and, in the absence of such evidence, his claims collapse as a matter of law.

## I.     SUMMARY OF MATERIAL UNDISPUTED FACTS

**A.     Walsh's Employment and 2007 Negotiation of Compensation.**

Zurich sells insurance products to automotive businesses. Zurich hired Walsh in November 1996 to be a Finance and Insurance ("F&I") Specialist for the Company.  B. Stoothoff ("Stoothoff") Direct Testimony ("Dir.") (Tr. Day 1). In 1999, the Company promoted Walsh to the position of Regional Sales Manager in its Bedford, New Hampshire office.  Stoothoff Dir. (Tr. Day 1).

On September 17, 2007, Walsh informed his boss, Anthony Stoothoff ("A. Stoothoff"), that he had decided to accept an offer with GMAC, which was a competitor.  Walsh Dir. (Tr. Day 2). Shortly after Walsh informed A. Stoothoff of his resignation, Walsh received a phone call from Dennis Kane ("Kane"), then Zurich's Senior Vice President of Direct Markets, who contacted him to persuade him to stay with Zurich.  Walsh Dir. (Tr. Day 2).

Over the course of the next two weeks, Kane and Bill Stoothoff ("B. Stoothoff"), then Vice President of Zurich's F&I Department, spoke to Walsh several times to negotiate new compensation terms and job duties that would entice Walsh to remain with Zurich.  Stoothoff

Dir. (Tr. Day 1); Walsh Dir. (Tr. Day 2). Walsh told B. Stoothoff that he required three terms for him to stay with Zurich: (1) a job description that would allow him to grow; (2) a guarantee from Zurich that it would pay him $250,000.00 annually for the next eighteen months; and (3) an incentive based pay plan that would kick in at an unspecified date before the end of the guarantee period. Stoothoff Dir. (Tr. Day 1). According to Walsh, when the parties discussed the incentive pay terms, they did not discuss the nature, the quantity, or the date of the incentive pay. Walsh Dir. (Tr. Day 2). Instead, Walsh testified that B. Stoothoff and Kane said that they would work to provide him with an incentive-based pay plan prior to Walsh's supplemental pay expiring, but they did not specify a timeframe. Walsh Dir. (Tr. Day 2). Nobody said anything at all about what the incentive-based pay plan that they would work to provide would consist of. Stoothoff Dir. (Tr. Day 1); Walsh Dir. (Tr. Day 2).

When Kane and B. Stoothoff confirmed that Zurich would meet Walsh's terms, he decided to remain with Zurich. Walsh Dir. (Tr. Day 2). Walsh's decision to remain with Zurich was based on his discussion with Kane and B. Stoothoff, as well as on other factors. Walsh was glad to be able to stay in New Hampshire, rather than move to Chicago for the GMAC position. Walsh also wanted to stay with Zurich because he had established trust with B. Stoothoff, his coworkers, and with the Company generally over his tenure. Walsh Dir. (Tr. Day 2).

Zurich subsequently lived up to the promise it made to Walsh in September 2007. Stoothoff Cross (Tr. Day 2). Specifically, Walsh immediately assumed new job duties as Zurich's National F&I Manager. Stoothoff Cross (Tr. Day 2). In February 2008, reinsurance responsibilities were added to Walsh's job duties, and then were removed in October 2010. Stoothoff Dir. (Tr. Day 1).

Moreover, to satisfy Walsh's second term, Zurich paid Walsh $250,000.00 annually for

the next eighteen months, concluding with a payment in April 2009.  Zurich's compensation to Walsh during this timeframe was memorialized in several Supplemental Pay Plans.  In October 2007, Zurich and Walsh entered into a Supplemental Pay Plan, which provided Walsh with a supplemental monthly payment of $13,246.63 (in addition to his base salary), which brought Walsh's compensation to $250,000.00 annually.  Stoothoff Dir. (Tr. Day 1); Walsh Dir. (Tr. Day 2).  Subsequently, when Zurich increased Walsh's salary in August 2008, it revised the terms of his supplemental pay to maintain the $250,000.00 annual guarantee.  Walsh does not dispute that Zurich paid him $250,000.00 annually for eighteen months following his decision to stay with Zurich.  Walsh Dir. (Tr. Day 2).

Finally, Zurich satisfied Walsh's third request that it work to put an incentive compensation plan in place before the end of his guarantee.  On February 19, 2009, Zurich delivered a final, approved incentive pay plan to Walsh – well before March 31, 2009 when Walsh's then Supplemental Pay Agreement would expire.  The 2009 Incentive Plan National F&I Manager Zurich Direct Markets (the "2009 Incentive Plan") established Walsh's incentive compensation for the timeframe of April 1, 2009 through his resignation date. Walsh does not dispute that Zurich paid him all of his incentive compensation after April 1, 2009 in accordance with the terms of that pay plan.

As of April 1, 2009, Walsh had a salary of $135,000.00, supplemental monthly pay of $12,777.77, as well as payments pursuant to the 2009 Incentive Plan. Walsh Cross (Tr. Day 3). Zurich paid Walsh $377,666.51 in 2009, and $303,673.48 in 2010 for his services to the date of his resignation.  Stoothoff Cross. (Tr. Day 2).

**B.    Communications Between Walsh and Zurich Concerning the 2009 Incentive Pay.**

In June 2008, Zurich and Walsh began discussions of Walsh's incentive compensation

arrangement that would later become the 2009 Incentive Plan.  In the early discussions, Zurich and Walsh discussed factors that may impact Walsh's pay going forward, such as the marketplace, 2009 premiums, expenses, and revenue goals, among other things.  Walsh Dir. (Tr. Day 2).  Walsh testified that it was understood that Kane and B. Stoothoff would establish the percentage Walsh would be paid based on revenue goals.

Over the next few weeks, Walsh, Kane, B. Stoothoff, and Diane Eldridge ("Eldridge"), a Zurich Compensation Consultant, exchanged e-mail correspondence concerning various terms of the 2009 Incentive Plan draft.  For instance, on August 21, 2008, Eldridge sent Walsh a draft of the plan for his review ("August 2008 Draft Plan").  Walsh Dir. (Tr. Day 2).  The August 2008 Draft Plan provided Walsh with incentive payments of 1.125% of business written through alternative distribution channels, when certain conditions were met.  Id.  After reviewing the draft, Walsh sent an e-mail in which he noted that the definition of the "Alternative Distribution Channel" was too narrow and should be broadened.  Id.  Eldridge incorporated the change into the draft.  Eldridge Dir. (Tr. Day 3).  This e-mail exchange between Eldridge and Walsh was the last written communication about the draft plan until January 2009.  Id.  Walsh testified that all compensation arrangements required Kane's approval.  Walsh Cross (Tr. Day 3).

In December 2008, Walsh closed a deal with APCO, which Zurich and Walsh predicted would generate substantial revenue through Zurich's new alternative distribution channel.  Walsh Dir. (Tr. Day 2).  On December 29, 2008, Walsh e-mailed Eldridge to ask her some questions about his supplemental pay and the August 2008 Draft Plan.  Walsh Dir. (Tr. Day 2).  In the e-mail, Walsh asked for confirmation that his last supplemental pay check would be paid in April 2009, and he asked when the August 2008 Draft Plan would become effective.  Id.  Eldridge responded by confirming that his last supplemental pay check would be in April, and explaining

that his incentive plan would begin on April 1, 2009 because – pursuant to the language of the Supplemental Pay Agreement – supplemental payments were in lieu of incentives.  Eldridge Dir. (Tr. Day 3).  Eldridge's response was consistent with Walsh's understanding at the time.

In January 2009, Kane and Walsh resumed discussions of the August 2008 plan.  Walsh Dir. (Tr. Day 2).  Kane informed Walsh that he would be changing the manner in which his incentive compensation would be calculated under the plan.  Id.  Walsh objected to any changes several times over the course of that day, and Kane ultimately asked Walsh to make a recommendation concerning what he thought was fair.  Id.  Walsh forwarded Kane a proposal on January 27, 2009.  Id.

In the last week of January, Kane, Eldridge, and Walsh had a telephone conference in which Kane told Walsh that Zurich would pay him $1000 per $1,000,000.00 on the premium from the alternative distribution channel, rather than the 1.125% of business written through the alternative distribution channel that had appeared in the August 2008 Draft Plan.  Walsh Dir. (Tr. Day 2).  In an e-mail on January 30, 2009, Walsh wrote to Eldridge and Kane to confirm the recently proposed compensation terms.  Walsh Dir. (Tr. Day 2).  Specifically, Walsh states, "Hello, Just so I am clear I want to make sure I heard this right.  For 2009 we will continue with my supplemental at $250k until the end of the year.  Last check for December paid in January. For alternative distribution I will get paid $1000 per $1m in premium paid monthly."  Walsh Dir. (Tr. Day 2).  Eldridge later forwarded Walsh a revised 2009 incentive plan, which incorporates these terms.  Walsh Cross (Tr. Day 3). Referencing the revised draft, Walsh wrote back to Eldridge, "Looks good to me.  Thanks."  Walsh Cross (Tr. Day 3).

The final, approved plan was presented to Walsh on February 19, 2009.  Eldridge Dir. (Tr. Day 3).  Eldridge forwarded Walsh the most recent draft of the 2009 Incentive Plan by e-

mail, and stated, "Dennis [Kane] has approved both the NPPE and your incentive plan.  I will have Della's group send electronically the plan to your employees and to you."  Walsh Cross (Tr. Day 3).  Walsh testified that, starting on April 1, 2009, he received incentive payments in accordance with the 2009 Incentive Plan attached to Eldridge's February 19, 2009 e-mail.  Id.

Following Walsh's receipt of the final 2009 Incentive Plan, Walsh later acknowledged its terms again in writing.  In an e-mail chain between Kane, Walsh, and Colette Ruble ("Ruble"), Incentive Compensation Manager, in which the parties discussed the timing of compensation payments, Kane states, "I have an email from you on jan 30th $100 per 1m.  That's how the plan is written.  Let's stay w/ the plan doc as written."  Walsh replied to the e-mail, "Ok so $1000 this month and then the difference would roll over to the next month."  Id.

Subsequently, Walsh agreed to an addendum to the Final 2009 Incentive Plan, which simply clarified the timing of certain payments under the plan.  Walsh was sent a copy of this plan on May 13, 2009, and he acknowledged his acceptance of it via the company's computer system on August 25, 2009.

The 2009 Incentive Plan pursuant to which Zurich paid Walsh between April 1, 2009 and the date on which his resignation took effect – and all drafts of that document – explicitly reserved Zurich's unfettered discretion to alter or cancel the plan.  In relevant part, the August 2008 Draft Plan and all subsequent drafts up to and including the final April 2009 Incentive Plan, state:

- The purpose of the INCENTIVE PLAN is to establish a formula where by certain employees … **may, at the sole discretion of the President, be paid an INCENTIVE PAYMENT**;

- INCENTIVE under the PLAN shall be **solely within the discretion of the Executive Vice President of the COMPANY** and is subject to interpretation by him/her.  The PLAN is subject to cancellation by the Executive Vice President at any time; and

- **Management of the COMPANY reserves the right to limit INCENTIVE** in unique situations.

Walsh Cross (Tr. Day 3).

Walsh understood that Kane had to approve each pay plan before it became effective. Walsh Cross (Tr. Day 3). He also understood that each of the written pay plans was at the discretion of the Company and "could be changed in writing by [an authorized Company representative] or cancelled," and the pay plans pursuant to which Zurich paid him explicitly and consistently reserved those rights. Id. All of Walsh's supplemental pay plans between October 2007 and his resignation of employment contain such language. Id.

### C.   The GAIC Deal

In August 2010, Zurich entered into a contract with Great American Insurance Company ("GAIC"), pursuant to which GAIC ceded an entire business line to Zurich. McCafferty Direct (Tr. Day 4). The GAIC premiums were a special, one-time deal. Id. The premiums did not fit into the traditional classifications of revenue at Zurich and, as a result, the Company classified them as "alternate distribution channel" revenue. Notably, however, the premiums did not comport with any of the forms of alternate distribution channel revenue as defined in any version of Walsh's pay plan. Ingham Direct (Tr. Day 4). Specifically, they were not "General Agents, Banks, Third Party Administrators Original Equipment Manufacturers." Ingham Direct (Tr. Day 4).

Moreover, Terry McCafferty, Zurich's Chief Financial Officer, performed all of the work to close the GAIC deal. McCafferty Direct (Tr. Day 4). McCafferty had known GAIC's executives for over twenty years, and they called McCafferty when they were interested in ceding GAIC's business line. Id. McCafferty traveled to meet with the senior executives of GAIC several times. McCafferty negotiated with them and eventually closed the deal. Id.

Walsh played no meaningful role in negotiating or closing the deal.  McCafferty received no incentive pay from his work on the deal.

## II.    ARGUMENT

### A.    Directed Verdict Standard.

A directed verdict is required where legally sufficient evidence has not been put before the jury.  The First Circuit has summaries the standards governing directed verdicts as follows:

> We have followed the generally accepted rule that, "[w]en the evidence is such that without weighing the credibility of witnesses there can be but one reasonable conclusion as to the verdict," a directed verdict is proper . . . we have emphasized that "a scintilla of evidence isnot enough to warrant submission of an issue to the jury." . . . This is particularly true where, as in this case, the party seeking a directed verdict does not bear the burden of proof.

Liberty Leather Corp. v. Callum, 653 F.2d 694, 697 (1st Cir. 1981) (citations omitted) (affirming decision that single passing reference in testimony was only a scintilla of proof, and was not "legally sufficient evidence").  Where a plaintiff does not produce evidence to establish a basis on which reasonable people might disagree, or where "there is no legally sufficient evidentiary basis for a reasonable jury to find for the nonmovant under controlling law" the court should enter a directed verdict for the defendant.  See 9-50 Moore's Federal Practice - Civil § 50.60.

As set forth below, Walsh has presented insufficient evidence for the jury to render a verdict in his favor on any of his claims of breach of contract, breach of implied covenant of good faith and fair dealing, wrongful discharge, and violation of the New Hampshire Payment of Wages law.

### B.    Plaintiff's Breach of Contract Claim Fails as a Matter of Law.

*1.    Plaintiff's Breach of Contract Claim is Preempted by ERISA.*

Walsh's state law claim for breach of contract is preempted by ERISA Section 514(a).  ERISA applies to any "employee benefit plan" if it is established "by any employer engaged in

commerce or in any industry or activity affecting commerce." 29 U.S.C. § 1003(a)(1).  Zurich's payment of incentive pay to Walsh constituted *deferred compensation*, which Plaintiff has argued would continue past the date of his separation of employment (i.e., retirement benefits). As a result, these payments fall within the ERISA definition of "employee benefit plan." Kamenstein v. Jordan Marsh Co., 623 F. Supp. 1109, 1111 (D. Mass. 1985) (noting deferred bonus compensation falls within ERISA).

Because ERISA applies to this matter, Walsh's state law claim for breach of contract is subject to ERISA's preemption provision, Section 514(a).  Section 514(a) states, in pertinent part, that ERISA "supercede[s] any and all state laws insofar as they may now or hereafter relate to any employment benefit plan" covered by ERISA.  29 U.S.C. § 1144.  Because Walsh's breach of contract claim is based on state law, and because the claim is covered by Section 514(a), Walsh's state law claim is preempted.  See Pilot Life Ins. Co. v. Dedeaux --- U.S. ---, 107 S.C. 1549, 1553, 1558 & n. 4; Blakeman v. Mead Containers, 779 F.2d 1146, 1151 (6th Cir. 1985); Holland v. Burlington Indus., 772 F.2d 1140, 1146-48 (4th Cir. 1985).  Accordingly, the Court must dismiss Walsh's breach of contract claim as a matter of law.

2.     *Zurich Retained Discretion to Alter the Terms of Walsh's August 2008 Compensation Agreement Because He Was An At-Will Employee.*

Assuming, *arguendo*, that Walsh's breach of contract claim were viable, and he were able to prove that the August 2008 draft incentive was enforceable, Zurich had the right to alter the terms of this agreement because Walsh was an at-will employee.  Courts have recognized that employers are not forever bound by the terms of an at-will employee's compensation agreement. For example, Dumas v. Auto Club, Inc., 437 Mich. 521 (1991), involved an employer unilaterally changing its renewal commission compensation plan for at-will insurance agents.  The court held that plaintiffs, as at-will employees, could not sustain a breach of contract

claim, in part, because "[g]iven the traditional reluctance of courts to interfere with management decisions and the needed flexibility of businesses to change their policies to respond to changing economic circumstances, we conclude that [a breach claim] should not be extended to create legitimate expectations of a permanent compensation plan." Id. at 531. To hold otherwise would eradicate the very doctrine of at-will employment permitting employers to terminate their employees for any reason. Id. If an employer may terminate an at-will employee for any reason, good or bad, or for no reason at all, then it follows that it may, upon reasonable notice, change the terms of an at-will employee's compensation agreement.

While some courts have started to recognize limitations on the at-will employment doctrine in unique circumstances, none of these exceptions to at-will employment apply to the instant matter. For example, in Jordan v. Duff & Phelps, Inc., 815 F.2d 429 (7th Cir. 1987), the court held that while an employer can be "thoughtless, nasty, and mistaken" to an at-will employee, it may not be "avowedly opportunistic."[2] Here, however, Walsh cannot establish that Zurich acted in a way so extreme as to limit the doctrine of at-will employment. First, Walsh has failed to prove that Zurich altered the terms of his incentive plan simply to increase its profit. Dennis Kane provided reliable testimony that his CEO, Craig Fundum, made the changes to keep Walsh's compensation policy consistent with others in the Company in the same general job categories. See Kane Testimony (Deposition 64:6-14), Trial Day 2. In other words, the APCO deal played no role in Fundum's decision. Second, unlike most of the cases which have recognized an exception to at-will employment, Zurich did not terminate Walsh's

---

[2] Massachusetts has also recognized a narrow exception to the at-will employment doctrine holding that an employee may not be deprived of "identifiable, reasonably anticipated future compensation, based on [plaintiff's] past services, that he lost because of his discharge without cause." Gram v. Liberty Mutual Ins. Co., 429 NE.2d 21 (1981).

employment.[3]  Walsh has testified that he resigned. Walsh Cross (Tr. Day 3).  Walsh continued

to work under the terms of the February 2009, incentive plan until his voluntary resignation

eighteen months later in October 2010.  This is significant because even <u>Jordan</u> recognizes this

"avowedly opportunistic" standard is a high threshold and there is simply no evidence of this

level of malice on behalf of Zurich.  To hold otherwise would essentially require an employer to

show just cause every time it changes any condition of an at-will employee's employment.

Third, Zurich's actions could not be considered a breach of contract as there was no

mutual assent between the parties that the supposed August 2008 agreement would remain in

perpetuity.  Stoothoff testified that Walsh's incentive plans, as well as the incentive plans of

others, would change at least from year to year.  Stoothoff Cross (Tr. Day 2).  "The numerous

recent fluctuations show the company's changing compensation program and demonstrate that it

was unreasonable for [plaintiffs] to maintain any belief that their commission plan was to be

locked in permanently." <u>Dumas</u>, 437 Mich. at 545-46 (holding no mutual assent between parties

for permanent compensation plan).  As a result, even if the August 2008 draft agreement is

enforceable, there was no mutual assent that this agreement would remain in place forever.

    *3.    Even if Walsh Could Establish that the August 2008 Draft Incentive Plan*
           *Constituted an Enforceable Contract, Zurich Reserved the Sole Discretion*
           *to Cancel or Alter the Plan.*

Even if Walsh somehow were able to establish that the August 2008 Draft Plan

constituted an enforceable contract (and he cannot), the plain language of the document gives

Zurich the sole and absolute discretion to cancel or alter the plan.  This language alone

eviscerates Walsh's claim that Kane could not change the terms of the August 2008 Draft Plan.

<u>See</u>, <u>e.g.</u>, <u>Kellermann v. Avaya, Inc.</u>, No. 12-51249, 2013 U.S. App. LEXIS 12694, at *2 (5th

---

[3] The employer's duty to the plaintiff in <u>Jordan</u> also was substantially higher because he was a shareholder in a closely held corporation.  Indeed, the court noted that "[t]hings are otherwise [different] for closely held corporations." <u>Jordan</u> 815 F.2d at 431.

Cir. June 20, 2013) (affirming summary judgment finding on breach of contract claim concerning failure to pay incentive compensation because the policy expressly authorized defendant to adjust payments at its discretion); Foss v. Am. Tel. and Tel. Co., 199 A.D.2d 668, 670 (N.Y.S. 1993) (defendant's "unmistakably retained right to reduce or withhold commission payments, which was as much a part of that system as the specific provisions for calculating incentive commissions, is fatal to this claim as well."). As a result, Kane's changes to the compensation structure in January 2009 were entirely permissible pursuant to Zurich's broad reservation of rights in the agreement.

Courts that have analyzed this issue uniformly reject breach of contract claims based on incentive payments when the underlying plan document reserves for the employer unilateral discretion to withhold, alter, or change the plan. See, e.g., Sheehan v. Federal Deposit Insurance Corp., No. 94-1054, 1994 U.S. App. LEXIS 26852, at *6 (1st Cir. Sept. 26, 1994) (where the bonus plan expressly reserved to employer the exclusive power to approve all bonuses in the first instance, plaintiffs generated no trialworthy issue as to whether bonuses were withheld in bad faith); Chambers v. The Travelers Cos., Inc., 668 F.3d 559, 566 (8th Cir. 2012) (affirming finding that plaintiff was not contractually entitled to bonus where compensation policy stated that bonus was at the discretion of employer because, "[w]hen a contract term leaves a decision to the discretion of one party, that decision is virtually unreviewable); In re: Marc William Dittmar, 618 F.3d 1199, *17 (10th Cir. 2010); Brozo v. Oracle Corp., 324 F.3d 661, 667 (8th Cir. 2003) (noting that where commission plan unambiguously gave employer discretion to reduce commissions, the employer's decision is virtually unreviewable).

Here, there can be no dispute that the 2009 Incentive Plan – and all previous drafts of the plan – contained language in three separate provisions that reserved complete and absolute

discretion to Zurich to withhold, alter, or change incentive payments.  Indeed, *all* drafts of the plan state that the purpose of the plan is to establish a formula where employees *may, at the sole discretion of the President, be paid an incentive payment.*  Moreover, all of the drafts state that incentive payments shall be *solely within the discretion of the Executive Vice President of the Company* and that management of the company reserves the right to limit incentive in unique situations.  As a result, "[s]ince the terms of the Plan expressly reserved to [Zurich] management the unrestricted discretion to withhold approval" – and there has been no evidence of bad faith – Zurich is entitled to a directed verdict as a matter of law.  See Sheehan, 1994 U.S. App. LEXIS 26852, at *7.

4.     *Zurich and Walsh Never Reached a Meeting of the Minds on the Enforceable Terms of the August 2008 Draft Plan.*

Walsh cannot prevail on a breach of contract claim because he fails to meet an essential element of the claim, namely, that Zurich and Walsh had a meeting of the minds over the enforceable terms of the August 2008 Draft Plan.  See Chisholm v. Ultima Nashua Indus. Corp., 150 N.H. 141, 145 (2003).  Walsh contends that Zurich breached a contractual obligation to pay him 1.125% of business written through alternative distribution channels, which is the incentive formula contained in the August 2008 Draft Plan.  Complaint, ¶¶ 37-45.  Walsh's claim, however, simply ignores that the parties never reached a meeting of the minds concerning the August 2008 Draft Plan and, as a result, the document did not form a binding, enforceable contract.

To establish a breach of contract, Walsh must establish that (1) he and Zurich reached a meeting of the minds on the essential, definite and enforceable terms of the 2009 Incentive Plan; (2) Zurich breached the terms of the 2009 Incentive Plan; and (3) Walsh suffered damages from the breach. Behrens v. S.P. Constr. Co., 153 N.H. 498, 501 (2006) (citing Simonds v. City of

Manchester, 141 N.H. 742, 746 (1997)); Chisholm, 150 N.H. at 145.  The first element – a meeting of the minds – is present only when the parties assent to the same terms and indicate an agreement to be bound by them.  See Mangiardi Bros. Trucking, Inc. v. Dewey Envtl., LLC, Civil No. 12-cv-481, 2013 U.S. Dist. LEXIS 131132, at *7-8 (D.N.H. Sept. 13, 2013); Behrens, 153 N.H. at 501; Simonds, 141 N.H. at 746.  The mere fact that a party discussed the terms of a contract is insufficient to establish that a party has manifested its assent to be bound by the contract.  See Mangiardi Bros., 2013 U.S. Dist. LEXIS 131132, at *7-8 (finding no meeting of the minds to support contract formation where plaintiff alleged that defendant had discussed the terms of the contract with co-defendant and had paid an invoice to plaintiff in relation to the purported contract); see also Durgin v. Pillsbury Lake Water Dist., 153 N.H. 818, 821 (2006) ("the parties must have the same understanding of the terms of the contract and must manifest an intention, supported by adequate consideration, to be bound by the contract") (quoting Fleet Bank-NH v. Christy's Table, 151 N.H. 285, 287-88 (1996)).  Moreover, mere mental assent is not sufficient; a meeting of the minds requires that the agreement be manifest based upon an objective standard.  *Durgin,* 153 N.H. at 821.  Further, an agreement to enter into a contract which leaves the terms of that contract for future negotiation is too indefinite to be enforced.  See, e.g., Mass. Eye and Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215 (1st Cir. 2005), *affirmed as to liability and damages and vacating attorney fee award in* 552 F.3d 47 (1st Cir. 2009).

Walsh cannot establish that he and Zurich formed a meeting of the minds concerning the August 2008 Draft Plan that would have paid him 1.125% on business written through alternative distribution channels.  As described more fully above, Walsh and Zurich exchanged several e-mails in August 2008 concerning the terms contained in the draft, in which they offered

various revisions to the terms.   The last communication that Walsh had in August 2008 concerning the draft plan is an e-mail from Eldridge to Walsh, in which Eldridge states, "Jim, I have updated the plan to include your edits to the below section of the plan."  Eldridge Dir. (Tr. Day 3).  Notably, Zurich witnesses have testified that the August 2008 draft plan was in its final version.  Eldridge Dir. (Tr. Day 3). In fact, Bill Stoothoff testified that when he left Zurich on August 29, 2008, the draft plan had not yet been finalized.  Stoothoff Cross (Tr. Day 2).  Nor is there any evidence in the record that either party agreed to the terms in the draft or acknowledged its binding nature.

Moreover, Walsh understood and acknowledged that, at all times, he knew that a compensation plan was not effective until Kane had approved it, and the only approved incentive plan that he received from Kane was the April 2009 Incentive Plan forwarded to him on February 19, 2009.  Walsh Cross (Tr. Day 3).  Where, as here, there is simply no evidence that the parties assented to be bound by the terms of the August 2008 Draft Plan, Walsh fails to meet the required showing for a breach of contract claim.  See, e.g., Mangiardi Bros., 2013 U.S. Dist. LEXIS 131132, at *7-8; Durgin, 153 N. H. at 821.

Indeed, the absence of any evidence to demonstrate a meeting of the minds in August 2008 only becomes more apparent when compared to the clear acknowledgment and assent demonstrated by both Walsh and Zurich in January and February 2009.  Specifically, on January 30, 2009, Walsh e-mailed Eldridge, Kane and Stoothoff, and stated, "Just so I am clear I want to make sure I heard this right…For alternative distribution I will get paid $1000 per $1m in premium paid monthly."  Walsh Dir. (Tr. Day 2). And, following that e-mail, Walsh received the first and only approval from Kane of the 2009 incentive compensation terms.   Eldridge forwarded Walsh a draft incorporating those terms, and stated, "Dennis [Kane] has

approved…your incentive plan."   Walsh Cross (Tr. Day 3).  Walsh replied, "Looks good to me.

Thanks."  <u>Id</u>.  Walsh also agreed to an addendum to this agreement, which further solidifies his

assent to it.  <u>Id</u>.  Accordingly, the overwhelming objective evidence clearly establishes that the

first and only meeting of the minds concerning the 2009 Incentive Plan occurred in February

2009.

      In <u>Syncom Industries, Inc. v. Wood</u>, 155 N.H. 73, 81 (2007), defendants Eldon Wood and

William Hogan brought a counterclaim against their former employer, Syncom, claiming that the

company had failed to pay them commissions under an employment agreement.   The

employment agreement at issue stated, "[T]he Company shall pay to the [employee] during the

continuance of this Agreement a fixed compensation at the rate of $1,000.00 per [week]…plus

commission once sales level is exceeded per discussion with [president/CEO]."   The record

revealed that the President and employee discussed the manner in which commissions would be

calculated and had determined the sales goal on which Syncom would pay commissions, but had

never reached a final agreement on the specific calculation of commissions.  <u>Id</u>.  In affirming the

district court's finding, the Supreme Court of New Hampshire determined that the record

revealed that the parties had failed to reach a complete meeting of the minds concerning the

calculation of commissions even where the parties had determined that Syncom would pay

commissions once sales reached a specific threshold – and sales had, in fact, reached that

threshold.  <u>Id</u>. at 83-84.  The Court found that where the parties failed to reach an agreement on

this essential term, there was no enforceable agreement. <u>Id</u>.

      Walsh – like Hogan and Wood – has no possibility of establishing that the parties had a

meeting of the minds concerning the terms of the August 2008 Draft Plan. Like Hogan and

Wood, Walsh discussed the terms of the incentive compensation arrangement with his employer,

but neither he nor Zurich had expressed an agreement to be bound by the terms.  Id. at 83.

Similar to the facts of Syncom, the commission formula was "a work in progress" at the time

when Walsh is seeking to designate it a binding contract.  Id.  And, similar to Syncom, the lack

of any evidence of a meeting of the minds on this essential term compels the conclusion that

there could be no enforceable contract on which to find a breach.  Id. at 82.  Accordingly, the

Court should grant summary judgment on Walsh's breach of contract claim.

Perhaps the most compelling evidence that the parties never reached a meeting of the minds

concerning the August 2008 incentive plan lies not in the above-mentioned emails, but instead in

the lack of emails from Walsh denouncing what he believed to have been a contractual violation

costing him several millions of dollars. Walsh's testimony that he never complained to anyone

other than Kane, who denies same, about the alleged changes to his incentive plan dooms his

claim. No reasonable person would have continued employment for another 18 months in abject

silence under similar circumstances. Simply stated, Walsh's claim does not pass the smell test

and is inconsistent with human nature.

   5.    *Alternatively, if Walsh Were Able to Establish that the August 2008 Draft Plan was an Enforceable Contract, it was Discharged by Accord and Satisfaction.*

   The doctrine of accord and satisfaction allows a party to a contract to accept a stated

alternative performance to satisfy the other party's existing contractual duty.  See Restatement of

Law 2d, § 281, *Discharge by Assent or Alteration.*  This defense rests upon a contract in which

the parties agree to the discharge of an existing obligation by means of a lesser payment tendered

and accepted.  Id.; see also DeCato Brothers, Inc. v. Westinghouse Credit Corp., 129 N.H. 504,

506-07 (1987); Jenkins v. Henry C. Beck Co., 449 S.W.2d 454, 455 (Tex. 1969).  The essential

elements of an accord and satisfaction are (1) proper subject matter; (2) competent parties; (3) an

assent or meeting of the minds; and (4) consideration.  See DeCato Brothers, 129 N.H. at 506-07.

Any purported contractual obligations of Zurich arising out of the August 2008 Draft Plan were discharged by accord and satisfaction.  See Restatement 2d, § 281; DeCato Brothers, 129 N.H. at 506-07.  While there is no dispute in the record that neither Zurich nor Walsh acknowledged or agreed to the final terms of the August 2008 Draft, the same cannot be said of the April 2009 Incentive Plan.  In January and February 2009, both parties acknowledged in writing the final terms of the April 2009 Incentive Plan.  Specifically, Eldridge communicated to Walsh that Kane had approved the plan, and Walsh wrote to Eldridge "looks good to me" in reference to the plan.  Walsh Cross (Tr. Day 3).  Walsh also agreed to an addendum to this agreement.  Id.  Moreover, Walsh admitted that Zurich paid him all compensation owed under the 2009 Incentive Plan and he, in fact, accepted incentive payments under the terms of the April 2009 Incentive Plan for the next nineteen months until his resignation of employment.  Id.  In short, the parties indicated through their communications and actions that they agreed to be bound by the terms of the April 2009 Incentive Plan, not the August 2008 Draft Plan.  As a result, even if Walsh could establish an agreement prior to April 2009, which he cannot, that agreement was discharged by the parties' subsequent accord and satisfaction.

### C.     Plaintiff Cannot Establish a Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing

In the absence of an enforceable contract, Walsh has no possibility of establishing a derivative implied covenant of good faith and fair dealing applicable to the parties.  See, e.g., Massachusetts Eye and Ear Infirmary, 412 F.3d at 230. Under New Hampshire law, a claim for breach of the implied covenant of good faith and fair dealing, like any other contract-based claim, depends in the first instance upon the existence of a contract between the parties.  See, e.g., Harper v. Healthsource N.H., Inc., 140 N.H. 770, 775-76 (1996).   The covenant may not, however, create rights and duties not otherwise provided for in the existing contractual

relationship, as the purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance.  See Massachusetts Eye and Ear, 412 F.3d at 230.  Indeed, "good faith performance or enforcement of a contract emphasizes faithfulness to *an agreed common purpose* and consistency with the justified expectations of the other party."  Harper, 140 N.H. at 775-76 (emphasis added) (internal citation omitted).

To support Count II of the Complaint – breach of the implied covenant – Walsh contends that Zurich (a) unilaterally diminished his compensation; (b) failed to pay him incentive compensation; and/or (c) forced him to resign.  Complaint at ¶ 49.  As a matter of law, Walsh cannot establish a breach of the implied covenant claim because, at all times, the written agreements between Zurich and Walsh preserved Zurich's right to prospectively and unilaterally adjust his incentive payments.  Thus, Walsh cannot contend that Zurich acted outside the explicit terms – or the spirit – of the incentive plan.  Moreover, Zurich never agreed to compensate Walsh at the 1.125 percent rate he seeks to recover. Instead Zurich did, in fact, compensate him at the agreed-upon $1,000 per $1,000,000 rate.  .  As a result, the Court should grant Defendants' motion for a directed verdict as to Count II of the Complaint as a matter of law.

### D.  Plaintiff's Wage Claim Fails as a Matter of Law.

As an initial matter, the payments at issue in this case are not wages.  To the contrary, the 2009 Pay Plan sets forth a measure of additional compensation to employees, which does not fall within any of the types of wages identified in the N.H. Payment of Wages law.  Plaintiff has presented no evidence on the record to establish that these payments meet the definition of commission under New Hampshire law.  Nor could he.  Zurich does not base its payments under the 2009 Pay Plan on each specific piece or product; rather they are periodic payments to incentivize performance within the market – and they are paid several months after the sale has been made, pursuant to a contract right.  Plaintiff has not met his burden of showing that these

payments are wages and, as a result, this claim should be dismissed.

Even assuming the payments in this matter did fall within the N.H. Payment of Wages law, Plaintiff's wage claim falters for the same reasons as his contract claim.  Here, the record evidence supports that Zurich paid Walsh all of the wages owed to him under the 2009 Incentive Plan.  In fact, Walsh concedes that he was paid all incentives owed to him under the 2009 Incentive Plan.  Walsh Cross (Tr. Day 3).

Additionally, further assuming that Plaintiff was able to show that the payments were considered wages under the N.H. Payment of Wages law, Plaintiff has failed to make any showing of willfulness.  Under the standard established in <u>Ives v. Manchester Subaru</u>, in order to find a willful violation of the wage statute, the withheld wages must have been voluntarily withheld, "with knowledge that the wages are owed and despite financial ability to pay them".  126 N.H. 796, 802 (1985).  It is clear that there was a dispute over the wages and they were withheld in accordance with the N.H. Payment of Wages law.  Moreover, there is no evidence that Kane – who approved the 2009 Pay Plan – altered the compensation formula in a deliberate attempt to prevent Walsh from being paid.  Accordingly, Walsh cannot establish that Zurich failed to pay him owed wages as a matter of law and the Court should grant Defendants' motion for a directed verdict as to Count IV of the Complaint.

## REQUEST FOR RELIEF

WHEREFORE, Zurich respectfully requests that the Court grant Defendants' motion for a directed verdict for Plaintiff's claims in their entirety and provide Zurich with any further relief that the Court deems just and proper.

Respectfully submitted,

ZURICH AMERICAN INSURANCE
COMPANY, AMERICAN ZURICH
INSURANCE COMPANY, UNIVERSAL
UNDERWRITERS INSURANCE COMPANY,

By their attorneys,

/s/ Christopher B. Kaczmarek
Christopher B. Kaczmarek
Donald Prophete(admitted p*ro hac vice*)
Asha Santos (admitted *pro hac vice*)
LITTLER MENDELSON, P.C.
One International Place, Suite 2700
Boston, MA 02110
(617) 378-6000
ckaczmarek@littler.com

Dated: December 12, 2014

## CERTIFICATE OF SERVICE

I, Asha Santos, hereby certify that on this 12th day of December 2014, the foregoing document was served via hand delivery upon counsel of record.

/s/ Asha Santos
Asha Santos

Firmwide:130538341.1 076230.1015