UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

James Walsh,
        Plaintiff

        v.                                    Case No. 12-cv-72-SM
                                              Opinion No. 2015 DNH 182
Zurich American Insurance Company;
American Zurich Insurance Company; and
Universal Underwriters Insurance Company,
        Defendants

**O R D E R**

Following a jury verdict in plaintiff's favor, the
defendants, Zurich American Insurance Company, American Zurich
Insurance Company, and Universal Underwriters Insurance Company
(collectively "Zurich"), moved for judgment as a matter of law
with respect to each of the plaintiff's claims.  See Fed. R. Civ.
P. 50(b).  Walsh objects and moves for an award of attorneys'
fees.  After hearing the matter, and for the following reasons,
the court denies Zurich's motion for judgment as a matter of law,
and grants Walsh's motion for attorneys' fees.

The defendants seek judgment as a matter of law on
plaintiff's breach of contract and wage claims on grounds that
1) the record fails to support the necessary finding that the
parties achieved a meeting of the minds with respect to an August
2008 incentive payment plan (that the jury found constituted a

binding contract); 2) the jury's finding that Zurich withheld wages from Walsh "willfully and without good cause" is inconsistent with New Hampshire law and is not supported by the evidence of record; and 3) even under a subsequent, February 2009, incentive plan, there "is simply no basis upon which to find that Walsh was entitled to payments" based upon a deal Zurich entered with the Great American Insurance Company ("GAIC").

In response to Walsh's motion for attorneys' fees, Zurich echoes its motion for judgment notwithstanding the verdict, arguing that, because there is insufficient evidence to support Walsh's wage claim, and no evidence tending to show that Zurich's failure to pay the contested amount was "[willful] and without good cause," Walsh is not entitled to attorneys' fees under the governing state statute: N.H. Rev. Stat. Ann. ch. 275:53.

## Background

The jury heard evidence supporting facts consistent with the verdict as follows.  After leaving Zurich's employment in October of 2010, Walsh filed suit seeking wages he claimed he was owed as an employee of Zurich.  Walsh testified that Zurich proposed, and he accepted, a salary incentive compensation plan in August of 2008 (the "Incentive Plan").  Walsh thereafter sold insurance

products in reliance on the Incentive Plan's terms.
Specifically, Walsh claimed he was entitled to be compensated
under the Incentive Plan for a significant deal that he began
negotiating in September of 2008 with Automobile Protection
Corporation ("APCO"), and that he closed in December of 2008.
The APCO deal would generate approximately $132,000,000 in
premiums for Zurich each year for up to five years, and generated
approximately $77,000,000 in premiums in 2009.  Under the
Incentive Plan, Walsh was entitled to incentive salary payments
equivalent to 1.125% of all premiums realized from sales made
through the alternative distribution channel ("ADC") program he
managed.  The APCO deal generated premiums realized from sales
made through the ADC program.

     Zurich refused to pay Walsh on the APCO deal under the terms
of the Incentive Plan.  Instead, it paid Walsh under a different
plan that it claims was a "final" incentive plan agreed to by
Walsh and Zurich in February of 2009, after Walsh closed the APCO
deal (the "Replacement Plan").  The Replacement Plan provided for
a much lower incentive compensation rate — only $1,000 per
$1,000,000, or .1%, of ADC premiums realized.  Walsh also claimed
incentive payments related to a subsequent deal with GAIC
pursuant to the terms of the Replacement Plan, but Zurich refused
to make that incentive payment as well.

Before giving the case to the jury, the court granted
Zurich's motion for judgment as a matter of law on a claim by
Walsh for wrongful termination.  After four days of trial, the
jury found by special verdict "that defendants breached the
August 2008 Incentive Plan by failing to fully compensate [the
plaintiff] for the APCO deal."  The jury also found that Zurich
withheld from Walsh "compensation that he was due for the APCO
deal willfully and without good cause."  The jury further found
that Zurich "breached the February 2009 [Replacement] Plan by
failing to fully compensate [Walsh] on the GAIC deal" and,
thereby, withheld from Walsh "compensation that he was due for
the GAIC deal willfully and without good cause."

### Legal Standard

"The standard for granting a Rule 50 motion [for judgment as
a matter of law] is stringent."  Malone v. Lockheed Martin Corp.,
610 F.3d 16, 20 (1st Cir. 2010).  A court may set aside a jury's
verdict and award judgment as a matter of law only "when the
evidence points so strongly and overwhelmingly in favor of the
moving party that no reasonable jury could have returned a
verdict adverse to that party."  Id.  In making that
determination, the court must "view the evidence in the light
most favorable to the verdict, making no determination[] of [its]
own as to the credibility of witnesses or the weight of the

evidence." <u>Rodriguez-Garcia v. Miranda-Marin</u>, 610 F.3d 756, 765
(1st Cir. 2010).  The court may not, therefore, "displace a
jury's verdict merely because [the court] disagrees with it or
would have found otherwise in a bench trial." <u>Ahern v. Scholz</u>,
85 F.3d 774, 780 (1st Cir. 1996) (internal citation omitted).
Put differently, Rule 50 relief is warranted only if the evidence
"is so one-sided that the movant is plainly entitled to judgment,
for reasonable minds could not differ as to the outcome." <u>Gibson
v. City of Cranston</u>, 37 F.3d 731, 735 (1st Cir. 1994); <u>see also</u>
<u>Murray v. Ross-Dove Co.</u>, 5 F.3d 573, 576 (1st Cir. 1993) (proper
to allow motion where evidence "would not permit a reasonable
jury to find in favor of the plaintiffs on any permissible claim
or theory").  Under the rule, the burden is on the moving party
to "specify . . . the law and facts that entitle [it] to the
judgment." <u>Coons v. Indus. Knife Co.</u>, 620 F.3d 38, 44 (1st Cir.
2010) (quoting Fed. R. Civ. P. 50(a)(2)).

     Zurich asserts that the record evidence fails to support the
jury's verdict in favor of Walsh.  The jury was carefully
instructed that it must find that the parties reached a meeting
of the minds with respect to the Incentive Plan (which point
Zurich vigorously contested) before it could be considered an
enforceable contract between Walsh and Zurich.  The jury was also
instructed that for Walsh to be entitled to payment under the

subsequent Replacement Plan for the GAIC deal, the GAIC deal must
have come within the scope of the plan's terms, and Walsh or
someone under his management or control must have played a role
in producing the deal.  And, the meaning of the phrase "willfully
and without good cause," as it is used in New Hampshire's wage
and hour law, was explained to the jury.

After having been fully instructed, the jury expressly found
that Zurich breached the Incentive Plan by failing to fully
compensate Walsh for the APCO deal; that Zurich breached the
Replacement Plan by failing to fully compensate Walsh for the
GAIC deal; and, on both counts, that Zurich withheld compensation
owed Walsh both willfully and without good cause.  The evidence
produced at trial adequately supports the jury's verdict and
Zurich has failed to demonstrate otherwise.

### Meeting of the Minds as to the Incentive Plan

The defendants contend that there is insufficient evidence
in the record to support the jury's finding that Zurich and Walsh
reached a meeting of the minds with respect to the terms of the
Incentive Plan such that it became the operative contract
controlling Walsh's incentive payment for the APCO deal (which
closed in December of 2008).

6

As determined by the Supreme Court of New Hampshire, and as explained in the jury instructions, an "employer's unilateral promulgation to present at-will employees of a statement of intent to pay and provide such economic benefits may be recognized under New Hampshire law as an offer to modify their existing relationship by means of a unilateral contract, which offer is subject to such an employee's acceptance by continued performance of his duties."  Panto v. Moore Bus. Forms, Inc., 130 N.H. 730, 731 (1988).  Because "compensation and fringe benefits are usual incidents of this contractually governed economic relationship, it is generally true that a statement on these subjects by the party who pays the compensation can be viewed objectively . . . as meant to be a subject of binding agreement."  Id. at 735 (citation omitted).  As with any other contract, for an offer and acceptance to form a unilateral contract, there "must be a meeting of the minds in order to form a valid contract.  A meeting of the minds is present when the parties assent to the same terms," which "is analyzed under an objective standard."  Chisholm v. Ultima Nashua Indus. Corp., 150 N.H. 141, 145 (2003) (citations omitted).

To support its contention that the parties never reached a meeting of the minds with respect to the Incentive Plan, Zurich relies on the same arguments it made to the jury at trial —

arguments that were plainly (and supportably) rejected.  First,
Zurich contends that the written Incentive Plan that Walsh
claimed he and various Zurich officers and agents agreed upon
could not have been relied upon as evidence of a "meeting of the
minds" because the document was plainly marked "draft" at the
bottom of each page.

Second, defendants point to trial evidence, and an alleged
absence of testimony from Walsh and other current and former
Zurich executives, to support its argument that no reasonable
jury could have concluded that the parties reached a meeting of
the minds as to the Incentive Plan.  For example, defendants
contend that Walsh's testimony did not establish that the parties
reached a meeting of the minds because, in an August 14, 2008,
meeting, at which Walsh claims that he, Kane (an executive with
salary setting authority), and Stoothoff (Walsh's immediate
superior) met to finalize his sales goals and incentive
percentages, the only specific language Walsh attributed to Kane
was, "Here's how we're thinking of paying you.  Does this look
right," as he handed Walsh an early copy of the Incentive Plan.
(emphasis supplied).  That statement, the defendants argue,
reflects ongoing negotiations, not a meeting of the minds.

Zurich also points to the following statements, among others, adduced at trial from Walsh that it claims support its theory that the Incentive Plan was never finalized: (1) Walsh testified he was "not sure" whether the Incentive Plan had been "implemented . . . through the company's incentive group"; (2) "[w]hether [the Incentive Plan] was finalized in Zurich's mind because it didn't go through [human resources] or anything else, I can't attest to that"; (3) "Mr. Stoothoff and Mr. Kane may have — once that meeting ended and we agreed to a plan, they may have had other things to do with it"; and (4) "I never heard of anything being final. I mean, that's backroom [human resources] or accounting. Whoever does that, I don't know."

The defendants further argue that Stoothoff admitted on cross examination that the Incentive Plan was not final, that he had no authority to bind Zurich to the agreement, that he had never received approval from Kane to finalize the agreement, and that the plan was still in draft form when he left Zurich at the end of August 2008. Similarly, according to Zurich, Diane Eldridge, who worked in Zurich's human resources department, confirmed during her testimony that the Incentive Plan was a draft that had never been approved by Zurich, and Kane gave no testimony that he gave final approval to implement the Incentive Plan.

The defendants also argue, seemingly for the first time in this motion, and certainly more explicitly than they argued at trial, that an August of 2008 email exchange among Walsh, Kane, Stoothoff, and Eldridge, in which Walsh asked to reconcile the definition of "alternative distribution channel" as it was used in one part of the plan, evidences a rejection of the Incentive Plan and a counteroffer by Walsh that Zurich never accepted. Zurich further alleges that the contrast in the volume and specificity of the confirmation emails exchanged regarding the Replacement Plan compared to those regarding the Incentive Plan is persuasive evidence that the parties never reached a meeting of the minds with respect to the Incentive Plan.

In opposing the defendants' motion, Walsh first points out that Zurich's denoting a document as a "draft" is not determinative, because the documentary evidence showed that the Replacement Plan that Zurich argued was the only incentive plan the parties had mutually accepted, was also marked as a "draft." Walsh also presented evidence that all incentive plans for sales managers were matrix plans like the Incentive Plan.

On the specific question of whether the parties reached a meeting of the minds with respect to the Incentive Plan, Walsh presented an email chain starting on August 22, 2008, in which

10

Eldridge circulated a draft of the Incentive Plan that contained the payment matrix that Walsh, Kane, and Stoothoff had agreed on the week before.  Kane was copied on the email.  Walsh responded, pointing out that the definition of "Alternative Distribution Channel" needed to be amended to match his anticipated sales responsibilities as properly set out elsewhere in the agreement. Kane responded, indicating that he thought Walsh was correct, but that he should work it out with Stoothoff if he could not reach Kane.  On August 27, 2008, Eldridge responded to Walsh that she had "updated the plan to include [his] edits . . . ."  Walsh pointed out that in her response, Eldridge did not refer to the Incentive Plan at that time as a "draft."

Walsh also provided the jury with an email from earlier in the day on August 27, from Kane, reporting up to his superiors, including Craig Fundum, head of Zurich Direct Markets, that with respect to the new Alternative Distribution Channels for Finance & Insurance ("F&I"), the "[s]tructure and resource allocation" was "[c]ompleted with key appointment of Jim Walsh — national F&I manager."  He further reported that "[i]nitial visits with customers are underway with positive initial reactions."  That email followed a meeting held earlier in the day to "finalize this plan" as stated in an email from Eldridge to Stoothoff and Walsh, who was at corporate headquarters for the very purpose of

11

finalizing Walsh's incentive plan.  Walsh testified that Eldridge
pulled out the Incentive Plan at the August 27 meeting, that
Stoothoff called in to finalize the plan, as he said he would in
the email to Eldridge, and Walsh left Eldridge's office
understanding that his incentive plan was agreed upon and in
place.  Zurich never contradicted that understanding — until
after the big sale to APCO was closed, that is.

As the defendants point out, email traffic regarding Walsh's
incentive quieted until after the APCO deal was signed.  At that
point, Walsh emailed Eldridge stating, "I have a few questions
for you about my plan for 2009 . . . .  Will the plan below
[referring to the Incentive Plan] go into effect starting 1-1-
2009?"  Eldridge's response did not deny that the Incentive Plan
was final, nor did she contend that it was still under
consideration.  Rather, Walsh testified that she conveyed to him
that "it's her understanding that [his] 2009 incentive plan will
begin April 1, 2009, with first payment in May, since [his]
supplemental payment [was] in lieu of incentive."

The jury also saw an email chain between Kane and Walsh from
January 2009, after the APCO deal was signed.  In response to
Kane's oral demand that Walsh propose a new incentive plan
(because Kane refused to pay him pursuant to the Incentive Plan

12

on the APCO deal), Walsh identified the matrix included in the
Incentive Plan labeled as his "current pay plan" in the email.
Kane did not respond with surprise, and did not suggest that no
incentive plan had been agreed upon.  Rather, he responded "we
will work it out . . . you're doing a great job," but noted,
"[O]ne thing that <u>needs</u> <u>to</u> <u>change</u> is no one is on a 250k salary
(unless you are [Craig] Fundum) so that won't work."  (emphasis
supplied).

Kane also admitted during his testimony that in December of
2008, after the APCO deal was signed, he told Walsh, "You're
going to make a lot of money on this deal."  From that statement,
in addition to the emails, the jury could reasonably infer that
as of December 2008, when the APCO deal was closed, Walsh had an
incentive pay entitlement in place as described in the Incentive
Plan.

In addition to the documentary evidence presented at trial,
Walsh testified that he and Kane, who Zurich conceded had
authority to bind the company with respect to Walsh's incentive
pay, had indeed reached a mutual agreement on the terms of the
Incentive Plan in August of 2008, and that Walsh had accepted the
terms by going out and landing the biggest sales deal in Zurich's
history.

13

With respect to the August 14 meeting, at which Walsh, Kane, and Stoothoff agreed to the terms of Walsh's incentive plan, Walsh testified that the conversation started with Kane putting a pay plan including the incentive terms in front of him and stating, "here's how we're thinking about paying you.  Does this look right?"  Walsh explained that the conversation continued, with him, Kane, and Stootoff discussing the dollar amount of his sales goal.  They settled on a goal of $8 million in sales, to which Walsh replied, "Yeah, I can agree with that."  Walsh further testified that in that meeting, he, Kane, and Stootoff agreed to the matrix box that contained his sales goals and corresponding incentive payment percentages, all as set out in the Incentive Plan.  Zurich made the point multiple times during the trial that Kane was the "only person that could approve a plan" for Walsh.

Based on that and other evidence, the jury could have reasonably concluded that Walsh and Zurich, through Kane, reached a meeting of the minds as to the Incentive Plan, and that Walsh reasonably relied upon that agreement in continuing to work. And, that when the magnitude of the APCO deal became apparent, Kane and others at Zurich decided to renege on the agreement simply because they thought, after the fact, that Walsh should not earn as much as the agreement provided (certainly not as much

14

as they earned).  Therefore, taking the evidence about the
Incentive Plan in the light most favorable to the verdict, as
this court must, there is no basis upon which to grant the
defendants' motion for judgment as a matter of law on the
plaintiff's breach of contract claim with respect to the
Incentive Plan as it applied to the APCO deal.


    APCO Compensation Withheld Willfully and Without Good Cause

    Next the defendants contend that the jury's finding, that
Zurich "withheld from [the] plaintiff compensation that he was
due for the APCO deal [under the Incentive Plan] willfully and
without good cause," is inconsistent with both New Hampshire wage
law and the evidence of record.


    Under New Hampshire law, "[i]f an employer willfully and
without good cause fails to pay an employee wages as required
under . . . this section, such employer shall be additionally
liable to the employee for liquidated damages in the amount of 10
percent of the unpaid wages for each day except Sunday and legal
holidays . . . or in an amount equal to the unpaid wages,
whichever is smaller . . . ."  N.H. Rev. Stat. Ann. 275:44(IV).
The Supreme Court of New Hampshire has "construed 'willfully and
without good cause' as a 'single phrase meaning voluntarily, with
knowledge that the wages are owed and despite financial ability

to pay them.'" <u>Chisholm</u>, 150 N.H. at 146 (quoting <u>Ives v.
Manchester Subaru, Inc.</u>, 126 N.H. 796, 802 (1985)).  The
defendants, however, point to another New Hampshire statute that
provides: "In a case of a dispute over the amount of wages, the
employer shall pay, without condition and within the time set by
this subdivision, all wages, or parts thereof, conceded by him to
be due, leaving to the employee all remedies he might otherwise
be entitled to, including those provided under this subdivision,
as to any balance claimed."  N.H. Rev. Stat. Ann. 275:45(I).  The
Supreme Court of New Hampshire has made it clear that the
liquidated damages provision "was not intended to impose
liability where the employer's refusal to pay wages is based upon
bona fide belief that he is not obligated to pay them."  <u>Ives</u>,
126 N.H. at 801.  However, it is up to the jury to determine
whether the employer had a "good faith belief" that it did not
owe the disputed wages because, for example, it claimed that the
document providing for payment was not an enforceable contract.
<u>See</u> <u>Chisholm</u>, 150 N.H. at 146.

    The jury's award of liquidated damages, then, is plainly
consistent with New Hampshire law, so long as the factual record
supports the jury's explicit finding that the defendants
"willfully and without good cause" failed to pay Walsh his
incentive payment for the APCO deal under the Incentive Plan.

Put another way, this court will not disturb the jury's verdict if there is sufficient evidence supporting its finding that Zurich knew it owed Walsh under the Incentive Plan for the APCO deal but refused to pay him despite its financial ability to do so.

The defendants argue, essentially, that because Zurich disputed in good faith that the Incentive Plan was an enforceable contract, it could not possibly have breached the agreement willfully and without good cause.  Zurich further asserts that there is no evidence in the record to suggest that its dispute was anything but bona fide and in good faith.  The jury, of course, disagreed.

The record evidence supports the jury's conclusion that Zurich acted "willfully and without good cause" in failing to pay Walsh on the APCO deal.  First, the jury could reasonably accept Walsh's testimony.  That is, that he and Kane met in Zurich's Overland Park, Kansas, headquarters in January of 2009; that Kane told Walsh that "he was not going to pay [Walsh] on the pay plan that they promised and agreed to back in August.  [Kane] said it needed to change;" and that Walsh was "shocked," and said, "Dennis, what do you mean you're not going to pay me on the pay plan that we all agreed to back in August?  I took the chance by

going out and doing this big deal.  If I don't make this deal, I
don't make any money.  I could have went [sic] after three or
four, and we wouldn't be having this conversation because the pay
plan would have stayed the same."  Walsh further testified that
Kane responded, "[T]hat's irrelevant.  You signed a big deal.
I'm not going to allow this pay.  I'm not going to allow you to
get paid on this plan going forward.  It's not going to happen."
Walsh further testified that he and Kane met on three separate
occasions and had conversations much like that one.  When asked
if Kane ever said that he had not agreed to the Incentive Plan,
Walsh testified that Kane never said they had not agreed to it.
Walsh's testimony, in the context of the January 2009 email chain
between Walsh and Kane described above, in which Walsh refers to
the Incentive Plan as his "current plan," — a characterization to
which Kane did not object — also supports the jury's finding.

     Thus, if the jury believed Walsh's testimony, it could
properly conclude that Kane very well knew that Zurich owed Walsh
compensation under the Incentive Plan for the APCO deal, but
refused to pay him, notwithstanding Zurich's ability to do so.
Properly viewed, there was sufficient evidence in the record to
permit the jury to determine that Zurich, through Kane, acted
willfully in failing to pay Walsh and without any good faith
belief that the Incentive Plan was not the operative and binding

compensation contract.  The jury could easily have accepted what was readily apparent from the evidence — Zurich agreed to a deal it later regretted when the incentive earned by Walsh struck Kane as "too much," because other higher-ups in Zurich (including him) did not earn as much.  Kane, it seems, reneged for reasons he likely thought at the time benefitted him personally.  The picture painted by the evidence is one not complimentary of either Kane, other management personnel, or Zurich itself — the evidence showed the jury, rather compellingly, that rather than celebrate the huge benefit to the company occasioned by Walsh's historic sale, Zurich sought to renege on the compensation it promised to pay the deal's generator.  In the rough and tumble of corporate business perhaps that type of conduct is no longer considered shocking, but still, the law can provide relief, and the jury rightly provided that relief.

### GAIC Deal Covered by the Replacement Incentive Plan

Next, defendants argue that there is insufficient evidence to support the jury's finding that Zurich breached the subsequent Replacement Plan, which prospectively reduced Walsh's incentive pay to "$1,000 per $1,000,000 on alternative distribution premium as described in the definition."  Zurich refused to pay Walsh any incentive on the reinsurance policy that Zurich sold to GAIC, resulting in a $101 million premium payment from GAIC to Zurich

in August 2010.  Zurich says the GAIC deal did not fall within
the scope of activity contemplated by the Replacement Plan.
Moreover, says Zurich, Walsh did not participate in the
negotiation or closing of the deal.

Defendants argue that the GAIC deal did not fit within the
definition of "alternative distribution channel," and it did not
involve "sale and servicing of Company accounts" as contemplated
in the Replacement Plan.  That plan provides in relevant part:

> Alternative Distribution Channel incentive pay shall be
> paid on net dealer, third party administrator, agency
> business and original equipment manufacturer remit
> . . . sold through Alternative Distribution Channels
> per the financial statement.
>
> Incentive on Alternative Distribution production shall
> be paid at $1,000 per $1,000,000 on alternative
> distribution premium as described in the definition.
>
> . . .
>
> "Alternative Distribution Channels" mean <u>all F&I
> business not distributed by Zurich Direct Markets Sales
> Forces</u>, i.e. General Agents, Banks, Third Party
> Administrators, Original Equipment Manufacturers.
>
> (emphasis supplied).

Zurich contends that premium revenue realized from the GAIC
deal did not derive from "General Agents, Banks, Third Party
Administrators, or Original Equipment Manufacturers," because
GAIC was an insurance company, and so is not covered by the

Replacement Plan.  First, based on the language of the Replacement Plan, it is clear that "General Agents, Banks, Third Party Administrators, or Original Equipment Manufacturers" are given as <u>examples</u> of the sources from which Alternative Distribution Channel revenue could originate; those examples did not constitute an exclusive list.  Rather, business coming in through Alternative Distribution Channels is defined as "<u>all</u> F&I business <u>not</u> <u>distributed</u> <u>by</u> Zurich Direct Markets Sales Forces . . . ."  (emphasis supplied).  On this point, Terry McCafferty, senior vice president and chief operating officer of Zurich Programs and Direct Markets (the Zurich executive who signed the GAIC reinsurance agreement) conceded at trial that the GAIC deal was not generated by Zurich Direct Markets Sales Forces.

Second, while the facts and arguments presented at trial and in this motion regarding the substance of the GAIC deal left much to be desired in terms of clarity, the documentary evidence presented to the jury supports the jury's verdict, because it demonstrates that the GAIC deal consisted of reinsurance sold to an agency through the Alternative Distribution Channel.  As such, it falls within the scope of the Replacement Plan, and nothing presented at trial compelled the jury to conclude otherwise.

According to the documentary evidence (and contrary to
Zurich's insistence that the GAIC deal involved Zurich's
"assuming" a line of GAIC's business), Zurich <u>sold</u> GAIC
<u>reinsurance</u> on a group of policies defined under the Guaranteed
Auto Protection and Excess Wear and Use Quota Share Reinsurance
Agreement, executed in August 2010.  Thus, as Zurich is in the
business of selling insurance and reinsurance, and because Walsh
still had "reinsurance responsibilities" as of the third quarter
of 2010 by Zurich's own admission in an internal email, and the
sale consisted of "F&I business not distributed by Zurich Direct
Markets Sales Forces," the GAIC deal involved the "sale . . . of
Company accounts" in the Alternative Distribution Channel, as
covered by the Replacement Plan.  Or, so the jury could have
reasonably found based on the evidence of record.

Under the terms of the August 2010 reinsurance policy, GAIC
continued to service the underlying policies with respect to
insured individuals, its own sales brokers, and any incoming
claims made under the policies.  Zurich would pay GAIC for losses
experienced on valid claims and have input on claim settlements
and litigation, essentially reinsuring the losses on the
outstanding policies.  In exchange, Zurich received monthly
reports and quarterly payments (or suffered losses) derived from
a formula that essentially provided Zurich with the premiums that

were paid by insureds on the covered policies, less the loss
amount and a commission paid to compensate GAIC for its overhead,
and for any payments made to other reinsurance companies GAIC was
required to look to for payment of losses before looking to
Zurich.

Further, in support of Walsh's argument that the GAIC
revenue came in through the Alternative Distribution Channel, the
jury heard testimony from Zurich vice president and head of the
F&I profit center, Kathi Ingham.  She conceded that Zurich
actually accounted for the revenue from the GAIC deal in its
financial statements as Alternative Distribution Channel revenue,
and did so because there were "probably more . . . negative
implications, that would have required some additional accounting
work" if it had been considered direct revenue.

Defendants also argue that language found in the "Purpose of
the 2009 Plan" section referring to "employees . . . assisting in
the sale and servicing of the Company accounts" somehow imposed
upon Walsh an obligation to perform some specific personal act
with respect to a particular deal in order to earn an incentive
payment for that deal.  First, the parties never asked this court
to construe the terms of the incentive plans as part of their
summary judgment motions.  While a jury could, on the developed

record, such as it was, interpret the language that way, it is also plausible, and consistent with the record, that the jury construed that language to define the type of employee that the plan intended to incentivize — employees who, as a general matter, "assist in the sale and servicing of the Company accounts," i.e. employees like Walsh.[1]

Finally, the jury was instructed that Walsh or someone under his management or control must have played a role in producing the deal.  McCafferty's testimony, if accepted, could easily have satisfied that requirement.  McCafferty testified that he took Walsh to Cincinnati, Ohio, to assist in the sales and servicing of Zurich products with respect to the GAIC deal.  Walsh supported McCafferty's testimony by confirming that he performed due diligence with respect to the deal, visited GAIC's offices, talked with its executives, and debated whether it was a good business deal for Zurich to pursue.

From the documentary evidence and testimony, the jury could have reasonably concluded that Walsh was entitled to incentive pay as described in the Replacement Plan for the GAIC reinsurance

---

[1] The parties also conceded at oral argument on this motion that Walsh did not have to personally sell anything in order to receive incentive pay on this, or any other, deal producing Alternative Distribution Channel revenue; he was compensated based on premiums realized through the ADC.

deal.  Therefore, the court will not disturb the jury's verdict on that issue.[2]

### GAIC Compensation Withheld Willfully and Without Good Cause

The court further finds that there is ample evidence in the record from which the jury could have reasonably found that Zurich withheld from Walsh his incentive payments on the GAIC deal willfully and without good cause, as previously described in this order.  Zurich, the jury could have supportably found, knew that the GAIC premium revenue fell within the scope of the Alternative Distribution Channel, but simply did not wish to pay Walsh, perhaps regretting that it had not been more precise in describing what revenue streams should be excluded from the incentive compensation provisions, and, based on an unguided subjective conclusion that the incentive obligation was just "too much," even if covered by the contract, refused to pay what was owed.

---

[2] Walsh argues that Zurich waived the right to seek judgment as a matter of law on this issue by failing to raise it in its motion at the close of Walsh's case or at the close of the evidence.  Because Zurich sought judgment pursuant to Rule 50 of the Federal Rules of Civil Procedure on Walsh's breach of contract, lost wages, and wrongful termination claims, which included his argument that he was entitled to contract damages and lost wages on the GAIC deal, Zurich adequately preserved its objection.  See Osorio v. One World Tech., Inc., 659 F.3d 81, 87–88 (1st Cir. 2011); Lynch v. City of Boston, 180 F.3d 1, 13 n.9 (1st Cir. 1999).

In an email from Zurich's accounting department received by Eldridge and others, Zurich admitted the following:

> The financial statements for August include a $105M in premium on the GAIC reinsurance deal.  <u>Based on the 2009 plan [excerpted in the email], we would pay $105,000 to Jim Walsh on this premium.  How would you like to handle the August incentive due to the current review of the 2009 plan and the dollar amount of the incentive payment?</u>  . . .  I will need to get approval by August 20 in order to get Jim paid correctly.  Thank you.  (emphasis supplied).

Subsequently, Walsh's then direct supervisor emailed Eldridge and Zurich's accounting department the following:

> Please pay 3rd quarter reinsurance incentive based on the current plan numbers.  Since Jim [Walsh] no longer has reinsurance responsibilities effective in the 4th quarter, he should not receive any additional incentive related to this segment.  <u>Can you or someone write an amendment to his plan that states this?  In addition, as we discussed, we should have an amendment that stipulates that Jim will not receive incentive related to the GAIC UPR transaction that posted in September for $101m.</u>

(D. Ex. 78) (emphasis supplied).

From that evidence, the jury could easily have concluded that Zurich knew that it owed Walsh $105,000 in incentive payments on one or more GAIC deals; that Zurich realized that the Replacement Plan as written provided for incentive payments to Walsh on the $101 million GAIC deal that posted during the 3rd quarter, while Walsh still had reinsurance responsibilities; that Zurich intentionally refused to pay him; and, instead, intended

to draft a retroactive amendment to Walsh's incentive plan to
deprive him of those incentive wages that Zurich knew it owed to
him. Therefore, the court will not disturb the jury's finding
that Zurich withheld from Walsh compensation he was due for the
GAIC deal willfully and without good cause.


Motion for Attorneys' Fees

Having found that there is sufficient evidence in the record
from which the jury could have found that Zurich violated New
Hampshire's wage and hour laws by "willfully and without good
cause [failing] to pay an employee wages as required under [N.H.
Rev. Stat. Ann. 275:44(IV)]," despite financial ability to pay
them, the court turns to Walsh's motion for attorneys' fees.


Under the provisions of N.H. Rev. Stat. Ann. 275:53, "the
court in any action brought under this subsection may, in
addition to any judgment awarded to the plaintiff . . . allow
costs of the action, and reasonable attorney's fees, to be paid
by the defendant." While the express language of the statute is
permissive, the Supreme Court of New Hampshire has construed the
language as follows: "when the court has found a wage claim
meritorious, it should exercise its statutory discretion by
awarding reasonable counsel fees, unless the court further finds
particular facts that would render such an award inequitable."

27

_Ives_, 126 N.H. at 804.  The Supreme Court further noted that "in all candor[,] it is difficult to envision circumstances in which equity would call for the denial of fees."  _Id._  This is not one of those exceptional cases.

Plaintiff's counsel has informed the court that it could find no wage cases published since _Ives_ in which a court denied attorneys' fees on equitable grounds in a meritorious wage case. Defense counsel has not pointed this court to any such case either, and the court has found none.

Defendants suggest that the policy rationale underlying the _Ives_ court's construction of the statute — namely "that the size of many wage claims is so small that the practical value of a plaintiff's verdict is often decidedly modest after counsel's fee has been deducted from the recovery" — should militate against a fee award here, where the wage recovery is substantial.  But a substantial wage recovery, alone, does not amount to "particular facts that would render such an award inequitable."  _See Ives_, 126 N.H. at 804.  Here, the award is indeed quite substantial, but Zurich's conduct in refusing to pay the wages due was not only wrongful, but intentional.  Plaintiff should recover his attorneys' fees.  He should not have had to expend time, energy, or money to recover the wages owed him.  And, Zurich, in equity,

28

should bear that burden, both in fairness to Walsh and, consistently with the purpose of the statute, to discourage Zurich and other employers from following a similar course in the future.

Finding no facts that would render an award of reasonable attorneys' fees inequitable in this case where the jury reasonably concluded that Zurich withheld wages from Walsh willfully and without good cause within the meaning of the New Hampshire statute, the court will grant the plaintiff's motion for attorneys' fees.[3]

## Conclusion

For the foregoing reasons, Zurich's renewed motion for judgment as a matter of law (document no. 116) is denied, and Walsh's motion for attorneys' fees (document no. 112) is granted. With respect to the motion for attorneys' fees, the parties shall submit a stipulation as to a reasonable award of attorneys' fees within 21 days of the entry of this order.  If they are unable to reach an agreement, the plaintiff shall submit a detailed motion

---

[3] Because the plaintiff has not shown that Zurich "has instituted or prolonged litigation through bad faith or obstinate, unjust, vexatious, wanton, or oppressive conduct," as contemplated by the standard for awarding attorneys' fees under the common law, the court does not award fees on that ground. See Harkeem v. Adams, 117 N.H. 687, 688 (1977).

for approval of a specific dollar amount of attorneys' fees and expenses, with substantiation, within 30 days of the entry of this order.  Defendants will then have the opportunity to object within 10 days of the filing of the motion for approval.


    **SO ORDERED.**

                                    _____
                                    Steven J. McAuliffe
                                    United States District Judge

September 29, 2015

cc:  Douglas J. Miller, Esq.
     Jamie N. Hage, Esq.
     Kathleen A. Davidson, Esq.
     Asha A. Santos, Esq.
     Donald S. Prophete, Esq.
     Christopher B. Kaczmarek, Esq.